IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| Kathryn Sarkisian,<br><br>    Plaintiff,<br><br>v.<br><br>City of the Village of Douglas, Michigan,<br><br>    Defendant. | CIVIL ACTION NO.: 1:25-cv-00593 |

**COMPLAINT FOR VIOLATION OF
CONSTITUTIONAL AND CIVIL RIGHTS**

1. *Gallus gallus domesticus*—better known as chickens—and their eggs are healthy, sustainable, and locally-sourced nutrition. Americans have raised chickens at home for centuries, and with rapidly rising prices and growing food-safety concerns, many do today.

2. In 2020, Defendant City of the Village of Douglas, Michigan ("City") adopted Ordinance No. 05-2020 (entitled "Chicken Permits"), *codified at*, Douglas, Mich. Mun. Code § 92.32 ("Chicken Ordinance"), establishing a permitting process for homeowners and residents to "keep not more than six hen (female) chickens" for personal uses such as "family pets, to lay eggs or for meat [or] for personal consumption[.]" *Id.* § 92.30. If an applicant submits the form, pays a fee, and conforms to the Chicken Ordinance's other requirements, the City issues a chicken permit.

1

3. However, if any neighbor objects *for any reason whatsoever* within 21 days of a property owner submitting a chicken permit application, the City is flatly prohibited from issuing a chicken permit, which "shall not be granted, with no right of appeal." *Id.* § 92.32(D).

4. No one objected when Plaintiff Kathryn Sarkisian ("Kathy") submitted her application to build a small coop and run for her chickens. After the City issued her a chicken permit, she spent $23,000 in reliance to build a coop and run, and to upgrade her property's fences as required by her permit.

5. She had completed the construction and was already raising six hens, when the City informed her that *after* it issued the permit, one of her neighbors had objected. The City told Kathy that she must stop raising chickens, and that she is barred from contesting the neighbor's decision. The City is also imposing daily fines, which continue to mount, and could exceed $200,000—placing Kathy in jeopardy of losing her home as well as her chickens.

6. Kathy brings this Complaint challenging the City's unconstitutional delegation of its governmental powers which give her neighbor a standardless and unreviewable veto over Kathy's use of her own property. Nearly a century ago, the U.S. Supreme Court held that it is unconstitutional for the government to give private third parties the absolute discretion to decide whether and how the City regulates land uses. *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928) (The requirement to obtain the consent of two-thirds of neighbors before building a home for the aged is a "delegation of power … repugnant to the due

process clause of the Fourteenth Amendment."). The Chicken Ordinance is the very essence of an arbitrary and capricious government action: it delegates to a single neighbor the power to compel the City to deny Kathy an ordinary and otherwise legal use of her property.

7. The Chicken Ordinance also deprived Kathy of her right to a fair and constitutional process by which she might have been informed of the neighbor's veto and contested it. Instead of providing Kathy written notice that it was revoking her chicken permit and giving her the opportunity to object, the City summarily demanded she get rid of her permitted chickens and informed her that this demand was the end of the matter because, under the Chicken Ordinance, no appeal is possible; the neighbor's veto is final. For more than 50 years, the U.S. Supreme Court has looked with disfavor on this type of "irrebuttable presumption." *Vlandis v. Kline*, 412 U.S. 441, 446 (1973) ("[s]tatutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments").

8. This Court's intervention is needed to protect Kathy's constitutional and civil rights to be free of arbitrary and capricious governmental actions, and to not have her ordinary and productive use of her property subject to the absolute control, caprice, and whim of her neighbors, all without due process of law.

## PARTIES

9. Plaintiff Kathryn Sarkisian is a lifelong Michigander and full-time resident of Douglas, Michigan.

10.  Defendant City is a municipal corporation organized under the laws of the State of Michigan. The City is the party solely responsible for the unconstitutional policies, customs, and practices challenged in this lawsuit.

## JURISDICTION

11.  This Court has subject-matter jurisdiction under 42 U.S.C. § 1331 (civil actions arising under the Constitution and laws of the United States), and 28 U.S.C. § 1343 (civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States).

12.  Plaintiff has a personal stake in the outcome and has been, and continues to be actually, concretely, and personally injured-in-fact and has suffered, and is suffering, an actual or threatened injury that can be fairly traced to the challenged actions of the Defendant, and these injuries are likely to be redressed by a favorable decision.

13.  There is an actual controversy between the parties such that this Court may declare the rights and other legal relations of the Plaintiff pursuant to 28 U.S.C. § 2201 (Federal Declaratory Judgment Act), regardless of whether further relief is or could be sought.

## VENUE

14.  Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391(b).

15. Defendant is a municipal corporation located within, and a resident of, this judicial district and division.

16. All or a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred within this judicial district.

17. The property that is the subject of this action is within this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

18. Kathy lives in Douglas, Michigan, in a house built by her grandparents at 3077 May Street ("the Property").

19. The Property is roughly 14,000 square feet and is zoned R-3, which allows typical residential uses including accessory uses by right.

20. The City is a small, semi-rural municipality lying between Lake Michigan to the west, and Kalamazoo Lake to the east.

21. In 2009, Kathy moved to the Property to care for her elderly parents, who then resided in the home.

22. In 2022, Kathy and her husband Sam bought the Property from Kathy's mom.

23. Kathy and Sam now own the Property in fee simple absolute and they live there full-time.

24. Kathy's 94-year-old mom still lives at the Property part-time. She lives the rest of the time at her nearby cottage on the shore of Lake Michigan. Kathy cares for her mom in both locations.

25. Kathy supports her family by running the company she started—the Cottage Concierge—which provides stewardship services to the many homeowners in the area who live elsewhere part of the year. The company currently employs five people.

### *Kathy Decided to Raise Chickens*

26. Kathy loves animals, and birds in particular. She aspires to eat a healthy diet composed entirely of organic foods. Eggs are a cornerstone of Kathy's family's diet because they are a source of vital nutrients that Kathy can control from start to finish.

27. In Kathy's view, eggs raised at home are vastly superior to store-bought eggs. Store-bought eggs come from chickens treated with hormones and antibiotics, some of which can be harmful to a person's health. Store-bought eggs are rarely fresh—having spent days or weeks in transit to the supermarket. By comparison, the eggs Kathy farms herself are always fresh, organic, non-GMO, and free of hormones and antibiotics. She also finds them better-tasting than any store-bought eggs.

28. So, in the spring of 2023, Kathy began to consider raising backyard chickens.

### *No One Objected and the City Issued Kathy a Chicken Permit*

29. The City's Chicken Ordinance allows the keeping of chickens in residentially zoned neighborhoods, provided certain conditions are met. The ordinance provides:

6

> Any person wanting to keep chickens within the city shall first apply for and obtain a permit from the City Clerk or their designee, before that person may legally keep chickens within the city.

Douglas, Mich. Mun. Code § 92.32.

30. Kathy contacted the City to better understand the requirements. She was put in touch with a City planning and zoning administrator, Joseph Blair ("Blair").

31. Over the phone, Blair explained that Kathy needed to apply for a chicken permit. He provided her with a chicken permit application.

32. Kathy completed the chicken permit application, describing the Property and proposed modifications needed to comply with the Chicken Ordinance's requirements. She submitted her completed application in May 2023.

33. The Chicken Ordinance requires the City, once it receives a complete application, to provide notice to certain neighbors to give them a chance to object:

> (C) Once a completed application form, application fee, and written consent of the owner of the real property have been submitted to the City Clerk or their designee, the city shall within ten business days send written notice of the application for a permit to keep chickens to the following:
>
> > (1) The physical property address of all adjacent real properties. For purposes of this division, "adjacent real properties" shall include all properties sharing a common lot line with the real property on which chickens are proposed to be kept, but shall not include properties sharing only a common corner point, without footage on a common lot line.
> >
> > (2) The address of record for the owner of all adjacent real properties, if that address of record is different from the physical property address.

Douglas, Mich. Mun. Code § 93.32(C).

34. Initially, no one objected to Kathy's chicken permit application.

35. On June 21, 2023, Blair marked the application "approved" and forwarded Kathy the chicken permit. Exhibit 1 is a true and correct copy of the permit.

### *Relying on the City's Chicken Permit, Kathy Spend Thousands to Build Her Chickens a Home*

36. With an approved City chicken permit in hand, Kathy set about building a coop and enclosure for her chickens—also known as a "run."

37. In reliance on the City's issuance of the chicken permit, Kathy spent approximately $18,000 constructing the coop and run.

38. In reliance on the City's issuance of the chicken permit and as required by the Chicken Ordinance, Kathy spent roughly $5,000 improving her perimeter fences, so that no one could see her chickens from the street.

39. She purchased six young hens (or "pullets") at her local feed store, naming the birds Isabella, Sunshine, Sugar, Cinnamon, Piper, and Butter. All six hens are with her to this day. Kathy doesn't keep roosters (the ordinance defines "chickens" to "not include roosters," nor does Kathy want any).

40. Kathy's coop and run are well-designed and regularly cleaned. Her chickens are quiet, odorless, and free from disease. There has been no increase in the presence of other animals on account of the birds. Under Kathy's care, the chicks have grown into healthy laying hens, and the birds now lay five to six eggs per day.

41. She has raised six hens essentially from birth and has bonded with the birds as pets—in the same way another person would bond with a cat or dog.

42. The fresh eggs they lay daily are a staple of Kathy's diet and a key ingredient in the food she serves her husband and mom.

### *After the City Issued Kathy's Chicken Permit, It About-Faced Solely Because of a Single Neighbor's Complaint*

43. In late June 2023, not long after Kathy began raising her chicks, Blair called and informed her that she was no longer permitted to keep chickens and must get rid of her birds.

44. In response, Kathy explained that the City had already issued a chicken permit, that no one had objected prior to the City issuing it (including her neighbor whose home is only 30 feet from her chicken run), and that she had already relied on the issued chicken permit by building the coop and run, buying her hens, and improving her perimeter fence.

45. But unknown to Kathy, a neighbor who lives part-time in another adjacent property more than 100 feet away had complained to the City ("objecting neighbor") after the City issued Kathy the chicken permit.

46. The Chicken Ordinance categorically forbids the City from issuing a chicken permit if "any person required to be notified" objects for any reason whatsoever, and further provides that the chicken permit applicant has "no right of appeal":

> (D) If the City Clerk or their designee receives an objection to the issuance of a permit from any person required to be notified of the permit application, within 21 days from mailing the written notice of the permit application, then the permit shall not be granted, with no right of appeal.

Douglas, Mich. Mun. Code § 92.32(D).

47. On information and belief, the City had failed to timely inform the objecting neighbor of Kathy's chicken permit application, but instead informed the objecting neighbor *only after* the City had already issued the permit to Kathy.

48. Blair responded to Kathy that because a neighbor had objected, Kathy would no longer be allowed to keep chickens, and because no appeal was allowable under the Chicken Ordinance, that was the end of the matter.

### *The City Failed to Follow its Own Requirements For Revoking Kathy's Chicken Permit*

49. The Chicken Ordinance also sets out what the City must do to revoke or suspend a chicken permit, and requires "written notice," and a "finding" that the permit holder has violated the permit or other City ordinances:

> Any permit may be suspended or revoked by the City Clerk or their designee, by written notice to the permit holder, upon a finding that the permittee has violated applicable city ordinance provisions or permit conditions.

Douglas, Mich. Mun. Code § 92.32(J).

50. Having never received the required written notice and with the City not making any findings that she had violated her chicken permit or other City laws, Kathy kept on raising her chickens as she had been doing.

### *Fifteen Months Later and Without a Hearing, the City Summarily Treated Kathy's Chicken Permit as Revoked*

51. In September 2024—nearly 15 months later—Kathy received a "courtesy notice" from the City alleging that she was "keeping chickens without a permit" and therefore "must remove chickens from residence until neighbors approve." Although the notice stated that it "provide[s] a time frame" in which to

comply, it provided no such time frame and, instead, appeared to require immediate compliance. Exhibit 2 is a true and correct copy of the City's "courtesy notice."

52. Just four days later, Kathy received a "notice of violation" from the City. This notice said that "[a]fter having received a complaint regarding an alleged violation on your property, an inspection was conducted" which "revealed multiple chickens that were observed on your property with no permit granted by the City of Douglas, in violation of Section 92.32 of the City of the Village of Douglas Code of Ordinances." Highlighted in yellow was the part of the Ordinance which reads "[i]f the denial was due to an objection from a neighboring property owner, then no appeal process is available." Kathy was therefore ordered "to abate the violations no later than September 24, 2024" by "remov[ing] any and all chickens from the listed property until a permit is submitted and approved by the City of the Village of Douglas." It also warned that "[f]ailure to comply with the code of ordinance violation may result in the issuance of a civil infraction citation and/or fines." Exhibit 3 is a true and correct copy of the first notice of violation.

53. In late September 2024, Kathy received a second "notice of violation" with substantially the same information as the first. The notice "ordered" her "to abate the violations no later than October 13, 2024." Exhibit 4 is a true and correct copy of the second notice.

54. On October 14, 2024, the City sent Kathy a third "notice of violation," labeled "final notice." This notice said "[y]ou are hereby ordered to follow the necessary steps to abate the above referenced violation within 30 days from the date

11

of this letter." It continued: "Abatement requires the following action, remove any and all chickens from the identified property until a permit is submitted and approved by the City of the Village of Douglas." Exhibit 5 is a true and correct copy of the third notice.

55. The third notice warned that "failure to comply with the Code of Ordinance violation [*sic*] by the time frame specified above ***will result*** in the issuance of a civil infraction citation and/or fines" (emphasis in original). It warned that "the fine for the first offense will be $50.00 plus costs, the fine for the second offense will be $150.00 plus costs, and the fine for the third and all subsequent offenses shall be $300.00 plus costs." And it emphasized: "***Be advised that a separate offense shall be deemed committed each day during or on which a violation or noncompliance occurs or continues***" (emphasis in original).

### *Kathy's Constitutional and Civil Rights*

56. The Fourteenth Amendment to the U.S. Constitution protects against arbitrary and irrational exercises of governmental power that interfere with property rights and personal liberties, and secures Kathy's rights, privileges, or immunities by prohibiting states and their instrumentalities such as the City from making or enforcing any law "which shall abridge the privileges or immunities of citizens of the United States[,]" and by prohibiting the City from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

57. The City is depriving Kathy of her constitutional and civil rights, including the right to make productive use of her land without unreasonable

governmental interference, the right to use her own property in what would otherwise be a lawful, non-nuisance manner, and the right to due process of law.

58.     The Civil Rights Act of 1871 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

59.     The City is a "person" and at all times relevant acted under color of state law within the meaning of those terms in 42 U.S.C. § 1983.

60.     Kathy is a citizen of the United States and a person within the jurisdiction thereof, and possesses the right, privilege, or immunity to own and make reasonable and lawful uses of property free of delegations to private individuals of governmental power to limit such uses, and possesses the right that governmental powers to regulate and restrict non-noxious uses of private property be exercised only by accountable public actors—not private individuals who are free to act in their own self-interest.

61.     Kathy has a legitimate claim of entitlement to her chicken permit, and also possesses a fundamental property and liberty interest in the use and enjoyment of her private property and home, including the right to engage in the keeping of animals in accordance with local health and safety standards, and Kathy's home, backyard, and chicken coop and run are also "property" as that term is used in the

Fourteenth Amendment.

### *The City Cited Kathy For Keeping Chickens Without a Permit*

62. In November 2024, Kathy received a citation for violating the Chicken Ordinance, and a summons to appear in Michigan's 57th Judicial District Court for a hearing based on the three violation notices. Prominently on the citation, it reads "keeping of chickens—no permit." Exhibit 6 is a true and correct copy of the citation.

63. Unless she complies, Kathy faces fines of up to $300 per day. This means that after a first offense of $50 and a second of $150, each day that Kathy keeps her chickens adds another $300 to the potential fine. However, the City has not informed her of the total amount of the threatened fine. If the City considers Kathy to have been in violation of the Ordinance from the time she began keeping chickens nearly two years ago, the fine could be more than $200,000. But even at minimum, if the City considers her to have been in violation only since the courtesy notice in September 2024, Kathy is still facing fines of more than $79,000.

64. She also faces an unstated amount in "costs" that can be assessed for violating the Chicken Ordinance. Kathy has no means of knowing the amount of these costs in advance.

65. The financial impact of the City's actions, if confirmed would be ruinous. It is impossible for Kathy or her family to pay between $79,000 and $200,000, and failure to pay would permit the City to seek a lien on Kathy's home, which could ultimately lead to foreclosure and loss of her family home.

66. Notwithstanding the Chicken Ordinances' patent facial

14

unconstitutionality, Kathy has been forced to defend herself against the City's demand for these ruinous penalties, to hire lawyers to contest the citation, has been compelled to attend multiple settlement and status conferences, and faces a trial on June 2, 2025.

## FIRST CLAIM FOR RELIEF
### Standardless Delegation, Arbitrary Exercise of Government Power
### (Substantive Due Process, 42 U.SC. § 1983)

67. Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs.

68. The Fourteenth Amendment imposes an obligation on the City to not act arbitrarily, capriciously, or irrationally, in adopting, implementing, and applying its laws.

69. By the actions set forth above, the City has deprived Kathy of property and liberty without due process of law, arbitrarily, capriciously, irrationally, and in a manner which shocks the conscience: by enacting and enforcing an ordinance that allows any adjacent property owner to unilaterally veto for any reason whatsoever Kathy's rights, privileges, or immunities secured by the Constitution and laws to keep chickens on her property, without meaningful standards or criteria to guide or limit an adjacent landowner's discretion regardless of individual circumstances, and without regard to whether Kathy has complied with all other municipal requirements or whether Kathy's use of her private property to keep chickens is harmful to the public, the City has permitted one private citizen to dictate the legal rights of another and thereby delegated government power to private individuals

without any standards, in violation of the Fourteenth Amendment. *See Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928).

70. The Chicken Ordinance, and its arbitrary enforcement against Kathy based solely on the subjective preferences of a neighbor, lacks any rational or conceivably legitimate governmental basis.

71. The City's purported revocation of Kathy's chicken permit without individualized review or consideration of the actual impact of her chickens on the public is entirely disconnected from any legitimate public health, safety, or welfare concern.

72. By its actions set forth above, the City has violated Kathy's rights under the Fourteenth Amendment and 42 U.S.C. § 1983 to be free of arbitrary, capricious, and irrational government actions, and the Chicken Ordinance is therefore void, unlawful, and unenforceable.

**SECOND CLAIM FOR RELIEF**

**Lack of Pre-Deprivation Notice
and Opportunity to Be Heard
(Procedural Due Process, 42 U.S.C. § 1983)**

73. Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs.

74. The Fourteenth Amendment requires that, before depriving someone of their property or liberty, the government provide individualized notice and an opportunity to be heard by a neutral decisionmaker.

75. The City's purported revocation of the chicken permit which it issued to Kathy with no objections from anyone, and its treatment of the issued permit as

void, without following its own procedures and standards set out in the Chicken Ordinance, and without any notice or opportunity to be heard by a neutral decisionmaker, and based solely on the objection of a single neighbor, deprived Kathy of due process of law.

76. Far from providing a fair hearing before a neutral decisionmaker, the Ordinance empowers self-interested neighbors to deprive Plaintiff of her property rights for any reason or no reason.

77. Nor does it provide the affected permit applicant with any opportunity to contest or appeal a neighbor's veto to a neutral decisionmaker.

78. Furthermore, the Ordinance, by not providing any hearing after a neighbor does not consent, also creates an irrebuttable presumption. Irrebuttable presumptions have long been disfavored under the Due Process Clause of the Fourteenth Amendment. *See Vlandis v. Kline*, 412 U.S. 441, 446 (1973).

79. By its actions set forth above, the City has violated Kathy's rights under the Fourteenth Amendment and 42 U.S.C. § 1983 to not be deprived of property or liberty without due process of law. The Chicken Ordinance is therefore void, unlawful, and unenforceable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests this Court grant the following relief:

A. Issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that the Chicken Ordinance violates the Fourteenth Amendment and 42 U.S.C. § 1983, both on its face and as applied;

17

B.  Issue a temporary, preliminary, and permanent injunction pursuant to Fed. R. Civ. P. 65 that prohibits the City and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with it, from enforcing the Chicken Ordinance against Kathy and all others similarly situated;

C.  Enter a judgment for damages under 42 U.S.C. § 1983 for the City's violation of Kathy's civil and constitutional rights, in an amount to be determined at trial, including but not limited to a judgment for nominal damages;

D.  Allow a reasonable attorney's fee under 42 U.S.C. § 1988; and

E.  Such further relief as this Court deems just and proper.

DATED: May 27, 2025.

Respectfully submitted,

Pacific Legal Foundation

/s/ Christina M. Martin
Christina M. Martin, Fla. Bar No. 010076
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
CMartin@pacificlegal.org

Austin Waisanen, Wyo. St. Bar No. 8-7023*
Wesley Hottot, Wash. St. Bar No. 47539**
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
AWaisanen@pacificlegal.org
WHottot@pacificlegal.org

Thomas Joffre Lambert, Jr. P86348
Thomas J. Lambert, PLC
PO Box 144
Jamestown, Michigan 49427
tlambert@tjlplc.com
(616) 275-2976

*Attorneys for Plaintiff*

\* application for admission pending
\*\* application for admission to be filed